UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA P. HERNANDEZ,

                Petitioner,

v.                                      Case Number: 06-CV-13604
                                      Honorable Victoria A. Roberts

CLARICE STOVALL,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Barbara P. Hernandez is incarcerated at Robert Scott Correctional Facility in Plymouth, Michigan. Through counsel, she filed a "Petition for Writ of Habeas Corpus," pursuant to 28 U.S.C. § 2254. (Dkt. # 1.)

A jury found Petitioner guilty of (1) first-degree murder, MICH. COMP. LAWS § 750.316, (2) first-degree felony murder, larceny, (3) first-degree felony murder, robbery, and (4) armed robbery, MICH. COMP. LAWS § 750.529. Petitioner was sixteen years old at the time of the offense. For those convictions, the Court sentenced Petitioner as an adult to three terms of life imprisonment for the murder convictions and a term of parolable-life for the armed-robbery conviction. In this habeas petition, Petitioner seeks relief from her convictions. She alleges her confession should have been suppressed prior to trial.

For the reasons discussed, the Court denies Petitioner's Petition.

I.

This case arises from the death of James Cotaling in Pontiac, Michigan, on May 12, 1990. Petitioner was tried, along with co-defendant James Hyde, for Cotaling's murder.

Petitioner and Hyde were found in Findlay, Ohio where Hyde was treated at the Blanchard Hospital Emergency Room for a stab wound.  The hospital called the police to investigate the stabbing.  While there, Petitioner spoke to the officer and told him that she and Hyde were on their way to New Mexico, but stopped at the hospital so that Hyde could be treated for a stomach injury.  As a result of that conversation, the officer asked to speak to Hyde, who ultimately agreed to a search of the car the two drove.  The search of the car revealed a Michigan license plate.  A computer check indicated the plate was stolen.

The Federal Bureau of Investigation ("FBI") became involved in the investigation of Petitioner and Hyde because of a possible interstate kidnapping.  Crystal Crawford, Cotaling's girlfriend, filed a missing persons report with the Auburn Hills Police Department on May 13, 1990 after Cotaling failed to return after borrowing her car on May 12, 1990 to run errands. Crawford gave police a description of Cotaling and her car, a Pontiac J2000.  Special Agent Michael T. Gearty received a call from the Auburn Hills Police Department regarding the possible kidnaping of Cotaling.  Subsequently, Agent Gearty traveled to Findlay, Ohio to investigate Petitioner and Hyde.

On September 6, 1990 a *Walker* (*People v. Walker* 374 Mich. 331 (1965)) hearing was held to determine the admissibility of Petitioner's confession to the police and FBI agents regarding her role in the crimes.  Testimony at the hearing showed Petitioner arrived at the Wood County Detention Center on May 13, 1990, and remained there for approximately five days before she was released to Detective Serna from the Pontiac, Michigan Police Department. Testimony revealed that during that period, Petitioner did not have any visitors, other than her mother and her step-father, and she only had contact with inmate guards, corrections officers,

and students at school.  Petitioner was given three meals a day and a physical examination.  She also had access to the facility's recreation area and was permitted to take a shower each day.

Further testimony at the hearing revealed that none of the officers represented to Petitioner's mother, Avellina Morales, that they would be more lenient or go easy on Petitioner if she gave a statement.  Agent Steve Kives, who was present during the interview of Petitioner at the juvenile detention center in Ohio, wrote down what Petitioner told them.  Her mother was present during Petitioner's interview.  Agent Kives testified that Petitioner read the statement and made a few corrections before signing it.  Agent Kives admitted in the hearing that the statement represented his interpretation of what Petitioner told them.  No formal recording of the interrogation was made.  Petitioner and her mother signed the statement.  Agents Gearty and Kives, and Lieutenant Ralph R. Monday of the Findlay, Ohio Police Department signed it as well.

The trial court found that Petitioner's confession was voluntary.  Jury trial began on April 1, 1991.  Petitioner and her co-defendant Hyde, had separate juries.  The pertinent facts of the case are as follows.

On May 13, 1990, sixteen year old Petitioner sat in the waiting room of the Emergency Room of Blanchard Valley Hospital in Findlay, Ohio, waiting for her boyfriend, James Hyde, to receive treatment for a stab wound to his stomach.  Officer Mike May of the Findlay Police Department was called to the Emergency Room to investigate the report of a stabbing.  Upon arrival, he spoke with Petitioner.

Officer May testified that he asked Petitioner her name, which she gave.  Petitioner indicated that she and Hyde were on their way to New Mexico, and that they stopped at the

-3-

hospital so that Hyde could have his injury treated.  When Officer May asked Petitioner about the car they drove, she told him that it belonged to a friend of Hyde's.  Petitioner was unable to provide Officer May with the name of the friend.

Next, Officer May spoke with Hyde.  Officer May testified that Hyde told him he and Petitioner were on their way to Texas.  Hyde said that he injured himself playing with a knife in the bathroom of a truck stop in Ohio.  Hyde told Officer May that he threw the knife away. Officer May then questioned Hyde about the car.  Hyde told him that he and Petitioner got the car from his father.

Because of inconsistencies in the stories, Officer May asked Hyde if he could search the car.  Hyde gave permission by signing a consent form.  Patrolman Bob Francis arrived shortly thereafter to assist Officer May.

A search of the 1982 gray Pontiac J2000 revealed that the license plate on the car was registered to Crystal Crawford, Auburn Hills, Michigan.  The officers found another license plate on the floor of the car, which was reported stolen out of Pontiac, Michigan.  The officers also found a plastic container for a knife sheath on top of clothing, along with blood-stained jockey shorts and a tee-shirt.

Officer May testified that he arrested Petitioner and Hyde, and that Patrolman Francis transported Petitioner to the Findlay Police Department.  Once at the police station, Petitioner was brought to an officer for an interview and was advised of her *Miranda* rights.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  At that time, Petitioner asked for her mother.  Officer May did not recall that Petitioner asked for an attorney.  According to Officer May, Petitioner was then taken to a juvenile detention facility in Wood County.  He had no further contact with

-4-

Petitioner.

Detective Michael E. Courtney testified that he was the officer who processed the car driven by Petitioner and Hyde.  He stated that when he searched the car, he found piles of men's and women's clothing in the back seat, along with some blood-stained men's jockey shorts and a tee-shirt.  Officer Courtney also testified that he found a screwdriver and a broken lock in a Kmart bag in the car.  An attempt was made to find latent fingerprints in the car; none was found.

Mary Hyde, Hyde's mother, testified that Petitioner and Hyde came to her home to pick up some of their things on the night of May 12, 1990.  Petitioner and Hyde entered the house through a kitchen window because they did not have a key.  Ms. Hyde said that at one point, she noticed a scratch on her son's abdomen.

Nancy Ballard testified that she was at a bar when someone came in and told her that the license plate on her car was gone.  She later confirmed that the license plate found in the car driven by Petitioner and Hyde belonged to her.

Officer William Chapman, the officer assigned to investigate the case, testified that he and Sergeant Jerry Knapp discovered the body of James Cotaling by following a map drawn by Petitioner.  Cotaling's body was found under a carpet and blanket in an abandoned house on Howard Street in Pontiac, Michigan.  Officer Chapman testified that there was a significant slash to the victim's chest and throat and that the body was covered in blood.  He also testified that there were numerous blood stains on the walls.  Officer Chapman was present when the medical examiner and evidence technician arrived at the scene.

Officer Michael J. Milosic, the officer called to the scene to survey and conduct a

-5-

preliminary examination, collected samples of hair, blood, and items with blood on them.  These

samples were shipped to the Michigan State Police Crime Laboratory for analysis.  Officer

Milosic also processed the house for latent fingerprints.

Charmaine Glisson, Hyde's sister, testified that Hyde came to her house on May 11, 1990

and told her that he was leaving the state.  Glisson testified that Hyde told her he would either

travel by bus or that Petitioner would steal a car after getting picked up by a stranger.  Detective

Robert Patton, who took a statement from Glisson, corroborated her testimony.

Lieutenant Monday of the Findlay, Ohio Police Department testified that initially,

Petitioner told him she wanted a lawyer and did not want to speak to him.  (Trial Tr. vol. V, p.

85, Apr. 8, 1991.)  However, he said that changed:

> Q.      Now, Barbara Hernandez had already indicated to you that
> she didn't want to talk to you and wanted a lawyer.
>          How did we get from that point to the point where you in fact take
> a statement from her?
>
> A.      The FBI agents had walked with me over to the juvenile
> court building, which was about a block from my office.
>
> Q.      And you were with them the whole time?
>
> A.      Yes, they walked with me because I was going to appear in the
> detention hearing because I had filed the formal charges on her.
>          So they walked over there, and, unbeknownst to us, her mother
> was there, and her mother came over to ask me what this was all about,
> and I told her.
>          As a matter of fact, her statement was, I introduced her to the FBI
> agents, and she said, "Why is the FBI," and her words was, [sic] "Why is
> the FBI involved in nothing but a stolen car?" and I told her that we felt
> that there probably was more to it.  There was a missing person.
>          And the mother says, "Well, what does my daughter have
> to say about that?" and I said, "She had nothing to say about it
> because she didn't want to make a statement."
>          The mother says, "Well, don't you think you ought to get my
> daughter's side of the story?"  We said, "Yes, we'd like to, but she don't

-6-

[sic] want to make a statement."
          She says, "Well, let me ask her."
          Then she came back and says, "She wants to talk to you
and tell you the truth."

(Trial Tr. vol. V, pp. 88-89, Apr. 8, 1991.)

Lieutenant Monday testified that Petitioner then executed a written waiver and gave a

statement in the presence of two FBI agents, Petitioner's mother, and himself.  Lieutenant

Monday showed the knife sheath to Petitioner, who told him that it originally contained a knife

that she purchased at a Kmart.  Petitioner told Lieutenant Monday that she gave the knife to

Hyde and that he used it to kill Cotaling.  Petitioner also drew a map for Lieutenant Monday that

indicated the location of Cotaling's body.  Lieutenant Monday later faxed the map to the Pontiac

Police Department.

Special Agent Gearty of the FBI testified that he and Agent Kives accompanied

Lieutenant Monday to Handcock County Juvenile Court on May 15, 1990 where Petitioner's

detention hearing was to be held later that day.  There, Agent Gearty introduced himself to

Petitioner's mother.   Agent Gearty testified that Mrs. Morales asked him why the FBI was

involved in the investigation.  Agent Gearty told Mrs. Morales that he would be happy to explain

in private.

Agent Gearty took Mrs. Morales to another room and told her that when Petitioner and

Hyde were arrested, they had a car belonging to a missing person.   Agent Gearty testified that

Mrs. Morales asked him what her daughter had said about the matter.  Agent Gearty told Mrs.

Morales that Petitioner had not made a statement.  Mrs. Morales then said she wanted to speak to

her daughter.

After speaking with her daughter, Mrs. Morales told Agent Gearty that Petitioner would

-7-

speak with him if she could go home after the interview.  Agent Gearty told Mrs. Morales that

Petitioner would not be permitted to go home.  Agent Gearty testified that Mrs. Morales spoke

with Petitioner again.  When she returned the second time, Mrs. Morales told Agent Gearty that

her daughter wanted to talk to him.  At the *Walker* hearing, Agent Gearty testified that he and

Agent Kives first asked Petitioner if she did want to speak with them without an attorney

present.  (Walker Hr, at 43)  Petitioner was then advised of her *Miranda* rights and along with

her mother and Agents Gearty and Kives, signed the waiver form.

During Petitioner's interview, she stated that she lived with co-defendant Hyde at his

mother's home for the last year until they were asked to leave.  They then moved into an

abandoned house on Howard Street in Pontiac, Michigan.

Petitioner told the agents that she and Hyde wanted to go to New Mexico to visit her

father but did not have transportation.  She stated that Hyde came up with a scheme to get a car.

Petitioner told Agent Gearty about the plan, which he later explained in court:

> Q.    Did Ms. Hernandez during the course of her interview
>       indicate how they planned on getting down to Las Cruces,
>       New Mexico?
>
> A.    Well, she said that they didn't have a car so they'd have to
>       obtain a car somehow to get down there.
>
> * * *
>
> Q.    And did she indicate what that plan was?
>
> A.    Yes. She said that Hyde told her to go out on the street near
>       the residence on Howard Street there and act like a
>       prostitute and try and lure a man who had an automobile
>       back to the house, and when they got him back to the
>       house, Hyde would jump the man, kill him and they would
>       take the man's car.

-8-

\* \* \*

> Q.      Did Ms. Hernandez indicate during the course of her statement what the manner of killing would be?
>
> A.      Yes.  She said that Hyde told her to go out and purchase a hunting knife and that this knife would be used to kill the individual.
>
> Q.      Did she say where he told her to purchase this knife?
>
> A.      Yes, he told her to get it at a K mart; so she went to the K mart store located at Glenwood and Perry Streets in Pontiac.

(Trial Tr. vol. V, pp. 106-108, Apr. 8, 1991.)

Petitioner told agents that she went to the Kmart in Pontiac, purchased a knife, brought it back to the abandoned house, and gave it to Hyde.  She then left and encountered a man in a gray car just outside the house.  The man pulled up to her and said, "I have some money if you have a place we can go."  (Trial Tr. vol. V, p. 109, Apr. 8, 1991.)  Petitioner led the man into the abandoned house.  That man was James Cotaling.

Once inside the house, Cotaling put his hand on Petitioner's arm.  Petitioner told Agent Gearty that she was frightened so she pulled away, telling Cotaling she had to use the bathroom. As Cotaling sat down to remove his clothes, Hyde came out of the kitchen and attacked him with the knife.  Petitioner told the agents that she closed her eyes while a scuffle ensued and when it ended, Cotaling no longer moved.  Hyde dragged the body a short distance and covered it with a blanket.

Petitioner gathered their belongings and the two drove to Mary Hyde's  house in Cotaling's car.  Hyde entered his mother's house through an open window and then let Petitioner in through a door.  At the house, Petitioner and Hyde collected clothes and personal belongings

-9-

and Hyde changed his shirt.  Petitioner and Hyde then drove south on I-75 in Cotaling's car.  At some point during the drive, Hyde disposed of the knife.

During the interview between Petitioner and the agents, Petitioner identified the white long-sleeved sweatshirt worn by Hyde when he attacked Cotaling.  She also identified Cotaling's car from a photograph, as well as the packaging from the knife she purchased at Kmart. Petitioner drew a map identifying the house on Howard Street where Cotaling's body was found.

Agent Gearty testified that the interview with Petitioner was interrupted when she left to attend a detention hearing.  When Petitioner returned from the hearing, Agent Gearty re-advised her of her *Miranda* rights.  Petitioner along with her mother and Agents Gearty and Kives signed a second waiver form before continuing the interview.

The medical examiner, Dr. Linda Biedrzycki, testified that Cotaling died from multiple stab and incised wounds and that the manner of his death was homicide.

Melinda Jackson, a laboratory scientist for the Michigan State Police, testified that analysis of the hairs taken from the victim's right hand, from under the victim's right foot, and clumps of hairs from the victim's back were similar in all respects to the known head hairs of Petitioner.

Petitioner's defense at trial was diminished capacity and she testified on her own behalf. Petitioner testified that she had a sexual relationship with Hyde that began when she was in the eighth grade.  Petitioner testified that Hyde was abusive to her throughout their relationship, and that he introduced her to drugs and alcohol, which they used daily.  Petitioner stated that Hyde taught her to earn money by behaving like a prostitute.  If Petitioner refused, Hyde become angry and hurt her by pulling her hair, hitting and kicking her, and throwing her against a wall.

-10-

Petitioner said that at times she tried to leave him, but he would take her clothes and lock her in a room, naked.

Petitioner testified that on the day Cotaling was killed, Hyde told her to pretend she was a prostitute to earn money so that they could leave town on a bus.  Petitioner earned some money, but Hyde said it was not enough.  Hyde then told her to pretend she was a prostitute and take someone's car.  Petitioner did not want to steal a car and when she failed to do so, Hyde became angry and hit her, yelled at her, smacked her face, and pulled her hair.  Following Hyde's directions, Petitioner purchased a knife and gave it to Hyde.  She then left the house.

Once outside, Petitioner saw Cotaling drive by the house slowly.  He stared and waved at her.  Eventually, Cotaling parked in the driveway and followed her into the house.  Inside the house, Cotaling touched her hair and her arm, which frightened her.  Petitioner told Cotaling she had to use the bathroom, at which point he sat down and began to remove his pants.  As Petitioner left the room, Hyde entered from the kitchen and attacked Cotaling.  Petitioner re-entered the main room and listened to the fight between the two men.  Eventually, the fighting stopped and Cotaling was dead.

Petitioner testified that she and Hyde left and went to his mother's house.  Petitioner did not tell Hyde's mother about Cotaling's murder because she was afraid Hyde would kill her and his mother.  After collecting some of their belongings, the two of them drove south until they stopped at a hospital in Findlay, Ohio.

After speaking briefly with police at the hospital, Petitioner told the officers she no longer wanted to talk and that she wanted an attorney.  After being detained for a few of days, she was brought to a courthouse where she spoke with her mother.  Based on this conversation,

Petitioner testified that she agreed to talk to the police because she believed that if she talked to them, she could go home.

Petitioner testified the FBI agents asked her questions and she responded yes or no. Petitioner denied that she had a plan with Hyde to lure a stranger into the house and kill him. Petitioner stated that Hyde never told her that he would kill the man.  Petitioner testified that she signed the statement drafted by Agent Kives because she thought that if she told the police whatever they wanted, they would let her go home.

Dr. James W. Johnson, a child psychiatrist, testified that Petitioner had an avoidant personality, which meant she was incapable of making a decision to destroy someone else, and thus could not form the intent to commit murder.  Dr. Johnson also characterized Petitioner as Hyde's "slave," who would do his bidding for fear that he would abandon her.  (Trial Tr. vol. VIII, p. 22, Apr. 15, 1991.)

The jury found Petitioner guilty as charged.  After a hearing on whether Petitioner should be sentenced as a juvenile or as an adult, the trial court sentenced her as an adult to natural life imprisonment without the possibility of parole.

Through counsel, Petitioner filed an appeal of right in the Michigan Court of Appeals raising a single claim:

> I.      Should [Petitioner's] confession have been suppressed in
>         view of the totality of the circumstances

The Michigan Court of Appeals denied Petitioner's appeal on February 4, 1994.  *People v. Hernandez*, No. 144252 (Mich.Ct.App. Feb. 4, 1994) (unpublished).  The Michigan Court of Appeals stated:

> Following her initial request for counsel, [Petitioner]

-12-

initiated questioning by the FBI agents after talking to her mother. Since [Petitioner] initiated the interrogation, her right to counsel was not violated.  <u>Minnick</u> v <u>Mississippi</u>, 498 US 146; 111 S Ct 486; 112 L Ed 2d 489 (1990); <u>Michigan</u> v <u>Jackson</u>, 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986).

Furthermore, given the totality of the circumstances, we find that [Petitioner's] confession was not involuntary.  <u>People</u> v <u>Cipriano</u>, 431 Mich 315; 429 NW2d 781 (1988). [Petitioner] was informed of her rights prior to interrogation and waived those rights.  Her detention in Ohio prior to being brought before the juvenile court was less than two days, which was in compliance with Ohio statutory requirements.  It does not appear that the agents exploited [Petitioner's] young age and low education level in obtaining her confession.  Indeed, [Petitioner] proofread the confession and corrected the errors she found. [Petitioner's] mental and physical state appear to have been sound.  She was not deprived of food, sleep, or necessary medical care.  She did not appear to be intoxicated nor was it likely that she had access to intoxicants while in detention.  The agents did not make any threats or promises or use improper coercive tactics to induce the confession.  Finally, [Petitioner's] mother was present when she made the confession.  For all those reasons, [Petitioner's] confession was admissible.

*Hernandez*, No. 144252, slip op. 1.

Petitioner then filed a *pro se* "Delayed Application for Leave to Appeal" from that decision in the Michigan Supreme Court, asserting the following claims:

I.      Should [Petitioner's] confession have been suppressed in view of the totality of the circumstances?

II.     Whether [Petitioner's] Constitutional rights were violated by being denied counsel at a critical stage?

III.    Whether [Petitioner] was denied [her] Constitutional rights of due process by her length of detention, her age and the failure to be brought immediately before a judge?

IV.     Whether [Petitioner] voluntarily gave a confession or was under duress?

-13-

V.      Whether [Petitioner's] statement should be admissible?

The Michigan Supreme Court denied the Delayed Application on December 6, 1994.

*People v. Hernandez*, 447 Mich. 1020, 527 N.W.2d 511 (Mich.1994) (Cavanagh, C.J., and

Levin, J., would grant leave to appeal).  Petitioner did not file a Writ of Certiorari with the

United States Supreme Court.

On October 3, 1996, Petitioner filed a *pro se* Motion for Relief from Judgment in the trial

court, pursuant to M.C.R. 6.500, raising the following claims:

> I.      Under the Michigan Constitution [] and U.S. [C]onstitution
> [], [Petitioner was denied her right] [t]o a fair trial [] [due
> to] the Prosecutor's improper conduct during trial and
> closing argument. "Can you imagine how the victim felt."
>
> II.     [Petitioner was] denied her right to a fair trail and Due
> Process of law under MI Const. 1963 [] and U.S. Const. [],
> [b]y the trial court's erroneous admission into evidence,
> admission [sic] of another non-charged crime–prostitution.
>
> III.    Under [the] Totality of the Circumstances [Petitioner's]
> confession should have been repressed [sic].
>
> IV.     Multiple convictions and sentences for counts of 1st degree
> murder and felony murder arising from [the] death of a
> single (one) individual violates the constitutional
> guaranttees [sic] against double jeopardy.
>
> V.      [Petitioner's] constitutional rights were violated by being
> denied counsel at [a] critical stage.

The trial court denied Petitioner's Motion on September 30, 1996.  *People v. Hernandez*,

No. 02-186340-FC (Oakland County Circuit Court, Sept. 30, 1996).  Petitioner then filed an

Application for Leave to Appeal from that decision in the Michigan Court of Appeals.  In lieu of

granting leave to appeal, the Michigan Court of Appeals remanded the case "to the trial court for

a ruling setting forth findings of fact and conclusions of law.  MCR 6.508(E).  The trial court is

-14-

directed in particular to address [Petitioner's] double jeopardy claim regarding multiple life

sentences in light of *People v Bigelow*, 229 Mich [App] 218, [581] NW2d [744] (1998)." *People*

*v. Hernandez*, No. 206329 (Mich.Ct.App. Sept. 18, 1998).

On October 29, 1998, Petitioner requested that the trial court appoint counsel to assist her

on remand and counsel was appointed on November 14, 1998. On November 25, 2002 the State

Appellate Defender Office was appointed as substitute counsel to assist Petitioner.

Counsel filed a Supplemental Motion for Relief from Judgment, withdrawing all but the

double jeopardy claim and re-arguing the double jeopardy claim in light of *Bigelow*, 229 Mich.

App. 218.

On January 26, 2006 the trial court issued an Opinion and Order granting Petitioner

partial relief on her Supplemental Motion for Relief from Judgment. The trial court ordered a

modification of Petitioner's Judgment of Sentence to reflect only a single first-degree murder

conviction, but denied to vacate her armed-robbery conviction. An Amended Judgment of

Sentence was then entered on January 26, 2006.

On February 3, 2006 the Oakland County Prosecutor filed a Motion for Rehearing in the

trial court. He did not challenge the trial court's ruling on the Motion but rather asked that

several references to his failing to respond to Petitioner's Motion be deleted, since he was not

served with a copy of the Order requesting an answer. As of this date, the trial court has not

ruled on the Motion. All parties agree it does not impact the timing or the filing of this Petition.

Petitioner filed a Petition for Writ of Habeas Corpus [Dkt. #1], on August 11, 2006,

raising the following claim:

> I.     Under the totality of the circumstances, [Petitioner's]
>        confession should have been suppressed.

-15-

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA), altered the standard of review that federal courts must apply when reviewing a Petition for Writ of Habeas Corpus.  The AEDPA standard of review applies to all Habeas Petitions filed after April 24, 1996, the effective date of the Act.  28 U.S.C. § 2254(d) imposes the following standard:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under (d)(1), a federal court may grant a Writ of Habeas Corpus under two different clauses, both of which provide two bases for relief.  Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005).

An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."  *Williams*, 529 U.S. at 409; *White*, 431 F.3d at 523.  Relief is available under this clause if the state-court decision either

-16-

unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Williams*, 529 U.S. at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state-court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004). "[A] federal-habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.

In analyzing whether a state-court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *but see Williams v. Coyle*, 260 F.3d 684, 699 n.8 (6th cir. 2001) (noting the Court sent mixed signals in *Williams,* 529 U.S. at 412 when, within Part II of the majority opinion, Justice O'Connor wrote the Court must look to "the relevant state court-decision[s]" to determine if a law was clearly established, while Justice Stevens writing for the majority in Parts I, III, and IV held "that a law is clearly established if it was decided at the time [the defendant's conviction] became final." *Coyle* followed Justice Steven's statement because it was more specific.). The Sixth Circuit recently stated:

> [h]owever, "the lack of an explicit statement" of a particular rule by the Supreme Court "is not determinative" of clearly established law, since "[t]he Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent."

*Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (quoting *Taylor v. Withrow*, 288 F.3d

846, 852 (6th Cir. 2002)).  Though the court may only look to Supreme Court holdings to

formulate the relevant rule of law, it may look to lower federal court decisions to better assess

"the reasonableness of a state court's resolution of an issue."  *Williams*, 529 U.S. at 412; *Stewart*

*v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  This Court is also bound by "prior Sixth Circuit

decisions concluding that federal law on a particular issue has been 'clearly established' by

certain holdings of the Supreme Court."  *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004).

Against that backdrop, the Court proceeds to address the merits of Petitioner's claim.

III.

Petitioner argues that her confession to aiding and abetting to a first-degree-murder

charge should have been suppressed prior to trial.  Petitioner claims that when she was taken into

custody, she told police she did not want to talk to them and requested an attorney.  Petitioner

claims she did not initiate contact or interrogation with police; rather, Petitioner argues that her

mother initiated the questioning and was used by the police as an agent to extract a confession

from her.  Therefore, Petitioner argues that the state court's failure to suppress her confession

was contrary to or an unreasonable application of United States Supreme Court precedent.

Respondent argues that the state court's decision to admit Petitioner's voluntary

confession did not result from an unreasonable determination of the facts in light of the evidence

in the state court record.  Respondent further contends that Petitioner must show more than that

the state-court decision was erroneous in order to be entitled to habeas relief.

A.

Assertion of the right to counsel is a significant event "that once exercised by the

accused" dictates that "interrogation must cease until an attorney is present."  *Edwards v.*

-18-

*Arizona*, 451 U.S. 477, 484-85 (1981) (quoting *Miranda*, 384 U.S. at 474). The reasoning

behind the *Edwards* rule is "to prevent police from badgering a defendant into waiving his

previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). However,

interrogation may be resumed if the suspect initiates further communication, exchanges, or

conversation with the police. *Minnick v. Mississippi*, 498 U.S. 146, 152 (1990) ("[w]e further

hold that an accused . . . is not subject to further interrogation by the authorities until counsel has

been made available to [her], unless the accused [herself] initiates further communication,

exchanges, or conversations with the police.").

In *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983), a plurality of the Court

interpreted the idea of initiation of further communication with the police after invoking a right

to counsel as the accused "evinc[ing] a willingness and a desire for a generalized discussion

about the investigation." Though the Court declined to define the word "initiate," it held that

"inquiries or statements, either by an accused or a police officer, relating to routine incidents of

the custodial relationship, [would] not generally 'initiate' a conversation in the sense in which

that word was used in *Edwards*." *Bradshaw*, 462 U.S. at 1045.

Thus, a valid waiver of the right to counsel by the accused may be found if the "waiver

was knowing and intelligent and found to be so under the totality of the circumstances, including

the necessary fact that the accused, not the police, reopened the dialogue with the authorities."

*Edwards*, 451 U.S. at 486 n.9.

Under this totality of the circumstances test, the Court finds that Petitioner validly waived

her previously invoked right to have counsel present during an interrogation; she reinitiated

communication with the police. Once Petitioner requested to speak with an attorney and her

mother, police did not attempt to question her.  Police allowed Mrs. Morales to speak, without

interruption, with her daughter in private.  At no time did police or FBI agents represent to Mrs.

Morales that Petitioner's cooperation in the investigation would enable her to leave police

custody.  Police approached Petitioner only after Mrs. Morales informed them that Petitioner

wished to speak with them.  Petitioner was then asked if she wanted to speak with the authorities

without an attorney present.  Subsequently, Petitioner was read her *Miranda* rights and signed a

waiver form, along with her mother and Agents Gearty and Kives.

　　　　There is no indication that the police pressured Petitioner's mother to cooperate with

their investigation or attempted to have Petitioner's mother elicit a confession from her daughter.

Authorities clearly communicated to Mrs. Morales that Petitioner would not be allowed to go

home if she spoke with investigators.  Agent Gearty only spoke with Mrs. Morales about the

FBI's involvement in the investigation after Mrs. Morales asked him specifically why the FBI

was involved.  At no time did the agents suggest to Mrs. Morales that she should speak with

Petitioner on their behalf.  Therefore, a claim that Petitioner's mother was used as an "agent" is

not supported by the record in this case.  Instead, by Petitioner sending her mother with the

message that she wanted to "talk to [the officers] and tell [them] the truth," she evinced a

willingness to communicate with the police about the content of the investigation, which enabled

the police to re-engage in interrogation.  (Trial Tr. Vol. V, pp. 88-89, Apr. 8, 1991.)

　　　　However, "even if a conversation taking place after the accused has 'expressed [her]

desire to deal with the police only through counsel,' is initiated by the accused, where

interrogation follows, the burden remains upon the prosecution to show that subsequent events

indicated a waiver of the Fifth Amendment right to have counsel present during the

interrogation." *Bradshaw*, 462 U.S. at 1045.  Petitioner signed two separate statements indicating that she understood her rights, including the right to have an attorney present during questioning. Petitioner signed each of these statements along with her mother and the FBI agents.  At no time during questioning did Petitioner say she wanted to speak with an attorney.

This Court finds that the state courts' determination that Petitioner waived her right to have counsel present during interrogation was not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.

B.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions against the accused.  *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986).  When a defendant claims that her confession was coerced, the government has the burden to prove that the confession was voluntary by a preponderance of the evidence. *Connelly,* 479 U.S. at 168; *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000).  "[P]olice overreaching is necessary for a confession to be found invalid under the Due Process Clause of the Fourteenth Amendment."  *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005) (citing *Connelly*, 479 U.S. at 164); *Seymour*, 224 F.3d at 554.

The voluntariness of a confession, whether made by a juvenile or an adult, is evaluated on the basis of the totality of the circumstances surrounding that confession.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).  In juvenile cases, the totality approach requires an "evaluation of the juvenile's age, experience, education, background, and intelligence" as well as the "circumstances surrounding the interrogation."  *Fare*, 442 U.S. at 725.  Additionally, there is a need to exercise "special caution"

when assessing the voluntariness of a juvenile confession, particularly when there is prolonged

or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or

other friendly adult.  *Haley v. Ohio*, 332 U.S. 596, 599-600 (1948)*; In re Gault*, 387 U.S. 1, 45

(1967).

      To determine the admissibility of a juvenile's confession, the court must consider the

following factors in applying the totality of the circumstances test:

> (1) whether the requirements of *Miranda* [] have been met and the defendant clearly
> understands and waives those rights, (2) the degree of police compliance with [statutory
> requirements] and the juvenile court rules, (3) the presence of an adult parent, custodian,
> or guardian, (4) the juvenile defendant's personal background, (5) the accused's age,
> education, and intelligence level, (6) the extent of the defendant's prior experience with
> the police, (7) the length of detention before the statement was made, (8) the repeated and
> prolonged nature of the questioning, and (9) whether the accused was injured,
> intoxicated, in ill health, physically abused or threatened with abuse, or deprived of food,
> sleep, or medical attention.

*Friday v. Pitcher,* 200 F. Supp. 2d 725, 735 (E.D. Mich. 2002).  Voluntariness

      Cases which have found a juvenile's confession involuntary often include some form of

mental coercion, denial of rights, intimidation, threats, or physical abuse in obtaining the

confession.  In *Haley* a fifteen-year old's confession was found involuntary after the boy was

taken from his home in the middle of the night and subjected to relentless questioning.  332 U.S.

at 597-601.  The boy was kept in custody for over three days and was not taken before a

magistrate or allowed to see a parent or attorney.  *Id.*  He was not informed of his right to

counsel.  *Id.*  Once before the magistrate, the boy appeared "bruised and skinned."  *Id.*

      Similar to *Haley*, the Fifth Circuit found an eleven year old's confession involuntary after

the child had been held in custody, unaccompanied by a parent or lawyer, for over three days.

*Murray v. Earle*, 405 F.3d 278, 288 (5th Cir. 2005).  The girl was found to be of "below-normal

intelligence," had no experience with the criminal justice system, was only briefly informed of

her rights prior to the interrogation, and the police told her that everyone "knew" what happened and she could only help her family by telling the truth. *Id.* at 288-89.

The coercion present in *Haley* and *Murray* starkly contrasts with two other cases where juveniles' confessions were found voluntary. In *Fare*, a sixteen-and-a-half year old's confession was found to be voluntary where there was no evidence that the juvenile was "worn down" by improper interrogation tactics, lengthy questioning, trickery, or deceit. 442 U.S. at 726. The boy "had considerable experience with police." *Id.* He was told he was being questioned in connection with a murder, his rights were explained fully, and no facts indicated he was unable to understand his rights. *Id.*

Likewise, in *Gachot v. Stalder*, the Fifth Circuit found a fifteen-year old's confession to the murder of his parents voluntary, after he freely agreed to go to the sheriff's office to answer questions. 298 F.3d 414, 420-21 (5th Cir. 2002*).* The boy was accompanied by his older half-brother, was repeatedly advised of his rights, and the officers were "non-oppressive," treating him "with kid gloves." *Id.* at 420. He was not subject to physical abuse or relentless questioning, or confronted with "spurious untruths." *Id.* Furthermore, unlike *Haley*, the boy was repeatedly advised of his full *Miranda* rights, including his right to counsel. *Gachot,* 298 F.3d at 420.

This Court finds that Petitioner's case is much more akin to the voluntary confessions in *Gachot* and *Fare*, than those in *Murray* and *Haley*. Like the juveniles in *Gachot* and *Fare*, Petitioner was apprised of her rights and the record indicates that she understood those rights and waived them by signing two "Waiver of Rights" forms. She was accompanied during the interrogation by her mother, who was present the entire time. Most significantly, Petitioner was

-23-

not subjected to physical abuse, mental coercion, trickery, or deceit like the children in *Murray* and *Haley*. The officers were truthful when they talked to Petitioner and there is no evidence that the officers somehow induced Petitioner's confession.

Petitioner's case is less egregious. There were no efforts to keep her mother away or to confront her with false testimony. Also, there was a break in the interrogation, rather than the five grueling hours that Haley was forced to endure. Moreover, there is nothing to indicate that Petitioner was mentally disabled or otherwise incapable of understanding the rights explained to her. *Garner v. Mitchell*, 557 F.3d 257, 262-63 (6th Cir. 2009) (upholding the waiver of rights of a nineteen year old man with an IQ that placed him in the "borderline range of intelligence" because police had no reason to believe he misunderstood the warnings and "the officers were otherwise reasonable and careful in giving the warnings and obtaining the confession"). These findings are overwhelmingly supported by the record.

Considering the cases and the totality of the circumstances, it is highly unlikely that a court would find Petitioner's confession was involuntary. She was not subjected to coercive interrogation tactics or denied any constitutional rights. She was apprised of her rights, understood them, and waived them intelligently, knowingly, and voluntarily by signing a form, twice.

However, there is no doubt that Petitioner's youth is a strong factor militating against the voluntariness of her confession; indeed, it seems that the confession of a sixteen year old obtained in those circumstances may be inherently involuntary. Nevertheless, the weighing of factors under the totality of circumstances test is a subject on which reasonable minds could differ. Here the state courts stated they weighed all relevant factors, and after doing so,

concluded that Petitioner's confession was voluntary.  Even assuming that the weighing of factors by the state courts in this case was incorrect, the balance is close enough that, in the final analysis, it is not unreasonable.  *Williams*, 529 U.S. at 411.  Keeping in mind the deferential standards of review under AEDPA, this Court is compelled to defer to the findings and the conclusion of the state courts.

The state courts knew they should apply a totality of the circumstances approach when evaluating Petitioner's claims, and this Court finds that they did so.  The state courts used the correct test and did not act "contrary to" applicable law.  The state courts did not fail to adequately consider the necessary factors: Petitioner was informed of her rights; Petitioner's age and low education level were not exploited; Petitioner's mental and physical states appeared intact; Petitioner was not deprived of food, sleep, or necessary medical care; the agents did not make any threats or promises or use improper coercive tactics to induce the confession; and, Petitioner's mother was present during the interrogation.

Additionally, the Michigan Court of Appeals found that there was no indication that Petitioner was coerced.  The Michigan Court of Appeals further noted that the testimony from the evidentiary hearing established that Petitioner's *Miranda* warnings were given to her, there was no allegation that the police failed to comply with the procedures for questioning juveniles, Petitioner was not held for a long period of time prior to the interrogation, and the police questioning was not prolonged or repeated.

In considering Federal Habeas Petitions, a federal district court must presume the correctness of state-court factual determinations;  a Habeas Petitioner may rebut this presumption only with clear and convincing evidence.  *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th

Cir. 2001); 28 U.S.C. § 2254(e)(1). Subsidiary factual questions in determining the voluntariness of a statement to police, such as whether the police engaged in intimidation tactics alleged by a Habeas Petitioner, are entitled to the presumption of correctness accorded to state-court findings of fact. *Miller v. Fenton*, 474 U.S. 104, 111-12 (1985). In this case, the factual findings by the trial court and the state-appellate courts, regarding the police interrogation, are entitled to the presumption of correctness because Petitioner failed to present clear and convincing evidence to rebut this presumption. *Pritchett v. Pitcher*, 117 F. 3d 959, 964 (6th Cir. 1997).

Because there are no other factors present which suggest that the police interrogation of Petitioner was coercive, the Michigan Court of Appeals' determination that Petitioner's confession was voluntary was not an unreasonable application of clearly established federal law entitling her to relief.

However, assuming that the trial court erred in admitting Petitioner's statement into evidence, Petitioner still would not be entitled to habeas relief. For purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of federal constitutional error, the appropriate harmless error standard to apply "is whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)). Petitioner's statement to the police, even if involuntary, was harmless. *See, e.g., Walendzinski v. Renico,* 354 F.Supp.2d 752, 761 (E.D. Mich. 2005) (finding that "petitioner's statements to the police, even if involuntary, were harmless in view of the fact that the contents of the statements were substantially identical to petitioner's testimony at trial.")

-26-

Aside from Petitioner's confession, evidence was presented at trial that clumps of hair, some of which had been forcibly removed and were completely consistent with Petitioner's hair, were found in the victim's right hand and underneath his right foot.  There was also evidence that at the time of the arrest Petitioner and Hyde were in possession of a car driven by the victim and which contained bloody clothing and packaging for a filet knife.  Furthermore, evidence showed that Petitioner and Hyde drove to a hospital using the victim's car so that Hyde could receive treatment for a stab wound.  Finally, when Petitioner and Hyde were interviewed at the hospital, they gave conflicting stories about their destination.

The state court decisions were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  Petitioner has not established that she is in custody in violation of the Constitution or laws of the United States.  Against that backdrop, Petitioner is not entitled to habeas relief on this claim.

IV.

The Court **DENIES WITH PREJUDICE** Petitioner's "Petitioner for Writ of Habeas Corpus" [Dkt. # 1].

**IT IS SO ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  April 21, 2009

The undersigned certifies that a copy of this
document was served on the attorneys of record
by electronic means or U.S. Mail on April 21,
2009.

s/Linda Vertriest
Deputy Clerk